**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

FAULKNER WALSH CONSTRUCTORS; )
H2W CONSTRUCTORS, INC.; and )
FOUNDATION SERVICES, INC., )
)
                       Plaintiffs, )
)
   vs. )
)
NATIONAL CASUALTY COMPANY; )
ATLANTIC SPECIALTY INSURANCE )
COMPANY; AGCS MARINE INSURANCE )
COMPANY; and ZURICH AMERICAN )
INSURANCE COMPANY, )
)    No. 3:20-cv-0270-HRH
                   Defendants. )
_____ )

O R D E R

Cross-Motions for Summary Judgment

Defendants move for summary judgment.[1]  Plaintiffs cross-move for partial

summary judgment.[2]  Both motions are opposed.[3]  At defendants' request, the court heard

oral argument.[4]

_____

[1]Docket No. 26.

[2]Docket No. 35.

[3]Docket Nos. 35 and 39.

[4]Docket No. 48.

ORDER – Cross-Motions for Summary Judgment                         - 1 -

<u>Facts</u>

Although the parties dispute the legal significance of the facts in this case, the underlying facts themselves are not generally in dispute. In June 2012, plaintiff Faulkner Walsh Constructors obtained a marine insurance policy, No. GIS-12-080-HP, from defendants National Casualty Company, Atlantic Specialty Insurance Company, AGCS Marine Insurance Company, and Zurich American Insurance Company. Faulkner Walsh procured the policy through MCM, an insurance brokerage in Seattle. The policy, which provided coverage from June 1, 2012, to June 1, 2013, covered Faulkner Walsh's fleet of nine vessels: three tugs (<u>War Horse</u>, <u>Frances Snow</u>, and <u>Centaur</u>), five barges (<u>David Nook</u>, <u>Cornell #10</u>, <u>Afognak 22</u>, <u>Delta Viking</u>, and <u>Delta Chief</u>), and a pusher boat (<u>Mac</u>). It provided $1 million of protection and indemnity (P&I) coverage for each vessel, plus several hundred thousand dollars of hull and machinery (H&M) coverage for each of the three tugs. Plaintiffs paid premiums to defendant totaling $72,710.00, comprised of $49,770.00 for the P&I coverage and $22,940.00 for the H&M coverage.[5]

The P&I policy for Faulkner Walsh's vessels provided, in relevant part, that:

> In consideration of the premium and subject to the warranties, terms and conditions herein mentioned, this Company hereby undertakes to pay up to the amount hereby insured . . . such sums as the assured . . . shall have become legally liable to pay and shall have paid on account of:
>
> . . . .
>
> Costs or expenses of, or incidental to, the removal of the wreck of the vessel named herein when such removal is compulsory by law; . . . .
>
> . . . .

---

[5]Docket No. 26-6 at 1-4.

Case 3:20-cv-00270-HRH   Document 49   Filed 07/11/22   Page 2 of 21

Costs and expenses, incurred with this Company's approv-
al, of investigating and/or defending any claim or suit against
the assured arising out of a liability or an alleged liability of
the assured covered by this policy.[6]

The policy also provided that defendants had the "option" of naming and directing

attorneys to defend Faulkner Walsh in litigation over covered claims.

This Company shall have the option of naming the attor-
neys who shall represent the assured in the prosecution o[r]
defense of any litigation or negotiations between the assured
and third parties concerning any claim covered by this policy,
and shall have the direction of such litigation or negotiations
. . . . The assured shall at the option of this Company permit
this Company to conduct, with an attorney of this Company's
selection, at this Company's cost and expense and under its
exclusive control, a proceeding in the assured's name to limit
the assured's liability to the extent, and in the manner pro-
vided by the present and any future statutes relative to the
limitation of a shipowner's liability.[7]

Besides the usual marine insurance provisions, the policy also contained a

provision entitled "Information."  The provision reads:

Information:  Recommendation compliance letters to be
completed/signed with regard to the "Frances Snow", "Delta
Chief" and "Centaur" prior to these vessels operating.

With regard to the "Delta Chief" – confirmation that the
hull is watertight via signed recommendation letter, survey
addendum, letter or email from the original surveyor, Jack
McFarland, will be deemed acceptable in lieu of the recom-
mendation to dry dock this vessel.[8]

The reason for the "Information" appears to have been a ship survey performed in

2011 in connection with the previous year's policy.  The surveyor, Jack McFarland, had

---

[6]Docket No. 26-6 at 8, lns. 10-13, 19-20, 28-30.

[7]Docket No. 26-6 at 9, lns. 70-72, 74-78.

[8]Docket No. 26-6 at 3.

ORDER – Cross-Motions for Summary Judgment                                      - 3 -

observed watertightness problems in a few of Faulkner Walsh's vessels, including the barge Delta Chief. McFarland opined that the Delta Chief was "still usable in the riverway," but recommended that it be drydocked and made watertight.[9]

In an email discussion regarding renewing the policy for 2012-13, the account manager at MCM told Faulkner Walsh that the Delta Chief's watertightness needed to be determined if it wished to purchase the new policy.[10] Faulkner Walsh responded simply, "Let's bind the quote," without mentioning the compliance letter.[11] The insurance broker bound the quote and followed up with Faulkner Walsh several times about a compliance letter or certificate of watertightness for the Delta Chief.[12]

On June 22, 2012, MCM wrote Faulkner Walsh to ask when it could expect to receive the Delta Chief's compliance letter and mentioned alternative methods of hull repair.[13] Faulkner Walsh responded with a request for a copy of the compliance survey form.[14] MCM provided the form, saying, "[i]n lieu of dry-docking [the Delta Chief], just a confirmation by a surveyor that she is watertight should work."[15] MCM followed up again on October 2, 2012, asking, in relevant part, "[d]id anything ever happen with

---

[9]Docket No. 26-3 at 3, ¶ 9.

[10]Docket No. 26-9 at 3.

[11]Id.

[12]Docket No. 26-9 at 1-2; Docket No. 26-13 at 2.

[13]Docket No. 26-9 at 1.

[14]Id.

[15]Id.

ORDER – Cross-Motions for Summary Judgment                                   - 4 -

confirming the Delta Chief is water tight? Please advise on that."[16] Faulkner Walsh responded, "[a]s for delta [chief], not sure what happened there."[17] The Faulkner Walsh employee who had been communicating with MCM forwarded the October 2 inquiry to another employee, saying, "? Don't really remember this."[18] The parties do not dispute that Faulkner Walsh never provided any compliance documentation for the Delta Chief.[19]

On October 4, 2012, the Delta Chief sank in a branch of the Kuskokwim River. Faulkner Walsh reported the Delta Chief's sinking to MCM on February 11, 2013,[20] and MCM informed defendants of it later that day.[21] Faulkner Walsh's initial efforts to raise the Delta Chief failed, although it managed to recover several trucks and loaders the barge had been carrying. In October 2013, the State of Alaska's Department of Environmental Conservation (DEC) sent Faulkner Walsh a "Notice of Violation" requiring it to submit a plan for remediating the environmental contamination the sunken barge was causing.[22] Faulkner Walsh told the State on two separate occasions in late 2013 and early 2014 that it would recover the barge as soon as conditions allowed.[23] But Faulkner Walsh

---

[16]Docket No. 26-13 at 2.

[17]Id.

[18]Id. at 1.

[19]Docket No. 26-5 at 3, ¶ 8; Docket No. 35-1 at 35-38.

[20]Docket No. 26-16.

[21]Docket No. 26-17 at 2-3.

[22]Docket No. 26-22.

[23]Docket No. 26-25 at 1.

had still not recovered the barge by the spring of 2016, prompting the DEC to refer the matter to the Alaska Department of Law for commencement of legal proceedings.[24]

On November 3, 2016, the State filed suit against Faulkner Walsh and the other two plaintiffs, H2W Constructors, Inc., and Foundation Services, Inc., in Alaska superior court.[25] The State alleged that plaintiffs had committed negligence, negligent trespass, intentional trespass, public nuisance, statutory natural-resource strict liability, and statutory unlawful abandonment of a vessel.[26]

Although defendants had been advised of the sinking of the Delta Chief on February 12, 2013, plaintiffs did not inform defendants of the State's lawsuit until May 2017, when plaintiffs' lawyer emailed defendants' adjuster to ask for information on the policy.[27] In late August 2017, after some mis-communication between the parties, defendants recognized plaintiffs' insurance claim for the Delta Chief's sinking and their tender of the defense of the State's lawsuit.[28] On September 15, 2017, defendants denied coverage and refused to defend plaintiffs against the State's suit.[29] Defendants told

---

[24]Docket No. 26-25 at 1-2.

[25]State, Dep't of Nat. Res. v. Faulkner Walsh Constructors, No. 3AN-16-09863CI. A copy of the complaint is contained in Docket No. 1-1 at 39-46. The case was later transferred to the Bethel superior court and renumbered 4BE-17-00064CI. Alaska CourtView, Case No. 3AN-16-09863CI, Docket Entry for Feb. 15, 2017, https://records.courts.alaska.gov/eaccess/searchresults.page?x=UjhpvHE0AU2FPof8mdF fnHkubnHKXUeHIXicONaOWaJ9*w04tLKy06iKFg737wKqOSPrU9RAsWkX57hamM FIMw (last accessed June 1, 2022).

[26]Docket No. 1-1 at 41-45.

[27]Docket No. 26-28 (Ex. W) at 1-2; Docket No. 26-29 (Ex. X) at 1-2.

[28]See Docket No. 26-31; Docket No. 26-32; Docket No. 26-33.

[29]Docket No. 26-34 (Ex. AC).

plaintiffs that the <u>Delta Chief</u>'s sinking was not covered under the policy due to Faulkner Walsh's "failure to comply with condition precedent to coverage" and "failure to provide prompt notice of claim."[30]   Defendants concluded that "because no coverage exists, [we] have no duty to defend Faulkner Walsh against [the State]'s suit."[31]

After two rounds of summary judgment motion practice and a one-day bench trial in December 2019 – at which plaintiffs neither filed a trial brief nor called any witnesses[32] – the superior court found plaintiffs liable to the State for $4,234,414.00 in damages.[33] The superior court later amended its judgment to include an additional $877,686.42 in interest, $150,000.00 in attorney fees, $3,754.73 in costs, and $12,755.19 in other fees.[34]

On September 14, 2020, plaintiffs filed the present suit against defendants in the Anchorage superior court.  Defendants removed the case to this court on October 20, 2020.[35]  Shortly before commencing this suit, plaintiffs and the State signed an agreement in which the State promised not to execute on the superior court's judgment while plaintiffs pursued their case against defendants here.  In exchange, plaintiffs agreed to

---

[30]<u>Id.</u> at 7-8.

[31]<u>Id.</u> at 8.

[32]Docket No. 1-1 at 58.

[33]Docket No. 1-1 at 56-62.  The superior court's damages figure provided for an additional five percent increase ($211,720.70) if the State's damages expert's estimate proved too low.  <u>Id.</u> at 61.

[34]<u>State, Dep't of Nat. Res. v. Faulkner Walsh Constructors</u>, No. 4BE-17-00064CI, Docket Entry for June 4, 2021: https://records.courts.alaska.gov/eaccess/searchresults.page?x=UjhpvHE0AU2FPof8mdF fnHkubnHKXUeHIXicONaOWaJ9*w04tLKy0-YvYkef0qIQ41knXSo64hCBBgpreYsf0 g (last accessed June 1, 2022).

[35]Docket No. 1.

diligently pursue this case and to assign to the State any damages or settlement money they recover from defendants until the superior court's judgment is satisfied.[36]

<u>Legal Standard</u>

Rule 56 of the Federal Rules of Civil Procedure allows parties to move for summary judgment on their claims or defenses or any parts thereof. Fed. R. Civ. P. 56(a). District courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. "An issue of fact is 'material' if it 'might affect the outcome of the suit under the governing law.' A dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" <u>S. Cal. Darts Ass'n v. Zaffina</u>, 762 F.3d 921, 925 (9th Cir. 2014) (citations omitted) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). Parties may offer evidence to support or oppose facts at summary judgment only if the evidence "could be presented in an admissible form at trial." <u>Zaffina</u>, 762 F.3d at 925-26 (quoting <u>Fraser v. Goodale</u>, 342 F.3d 1032, 1036-37 (9th Cir. 2003)).

When a party that does not have the ultimate burden of proof at trial moves for summary judgment, it "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden at trial." <u>Nissan Fire & Marine Ins. Co. v. Fritz Cos.</u>, 210 F.3d 1099, 1102 (9th Cir. 2000). If it succeeds, the nonmoving party must then "set forth specific facts" showing a genuine issue of material fact regarding its claim or defense. <u>Leisek v. Brightwood Corp.</u>, 278 F.3d 895, 898 (9th Cir. 2002) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986)). If the

---

[36]Docket No. 26-35 at 2-4.

nonmoving party does, it defeats the motion for summary judgment; if it does not, the moving party wins the motion. <u>Nissan Fire</u>, 210 F.3d at 1103.

When parties file cross-motions for summary judgment, the court "review[s] each separately, giving the non-movant for each motion the benefit of all reasonable inferences." <u>Flores v. City of San Gabriel</u>, 824 F.3d 890, 897 (9th Cir. 2016).

Discussion

Plaintiffs have alleged three causes of action against defendants: (1) breach of contract for violation of the duty to defend; (2) contractual breach of the covenant of good faith and fair dealing; and (3) tortious breach of the covenant of good faith and fair dealing. Defendants have moved for summary judgment on all claims, and plaintiffs have cross-moved for partial summary judgment on the issues of defendants' liability for each claim.

A. <u>Did Defendants Breach the Contract by Violating a Duty to Defend?</u>

In Claim 1, plaintiffs' complaint alleges that defendants breached the parties' insurance contract primarily "by failing to defend Plaintiffs against the State's claims in the Underlying Lawsuit."[37] Plaintiffs allege that because defendants violated their duty to defend plaintiffs, they are estopped from denying coverage for plaintiffs' insurance claims regarding the <u>Delta Chief</u>'s sinking.[38] Defendants deny both allegations. The parties have cross-moved for summary judgment on these two issues.

---

[37]Docket No. 1-1 at 8, ¶ 29.

[38]Docket No. 1-1 at 8, ¶ 31.

ORDER – Cross-Motions for Summary Judgment      - 9 -

<u>Did the P&I Policy Create a Duty to Defend Plaintiffs</u>
<u>Against the State's Lawsuit?</u>

Defendants assert that they had no duty to defend plaintiffs against the State's lawsuit because "there was no coverage under the Policy." They argue that the <u>Delta Chief</u> was not covered under their policy because Faulkner Walsh had voided its coverage when it failed to provide the required compliance letter. Defendants alternatively argue that even if the <u>Delta Chief</u> was covered, plaintiffs "voided coverage under the policy by failing to report to/cooperate with [sic] the insurers."[39]

Plaintiffs maintain that defendants had a duty to defend them under the policy. They argue that the State's superior court complaint "stated covered claims against Faulkner Walsh." They argue that this gave defendants sufficient notice to trigger their duty to defend them against the state's suit. They cross-move for a partial summary judgment ruling that defendants breached their duty to defend.[40]

Defendants respond that P&I policies do not create a duty to defend like ordinary liability policies do. They argue that their P&I policy gave them the option to participate in plaintiffs' defense against the State, but did not impose upon them a duty to do so.[41]

Because this issue involves the interpretation of a marine insurance contract, it presents a preliminary question of choice of law. In <u>Wilburn Boat Co. v. Fireman's Fund Insurance Co.</u>, 348 U.S. 310 (1955), the U.S. Supreme Court held that because insurance has traditionally been a province of state law, marine insurance contracts are not governed exclusively by federal admiralty law. <u>Id.</u> at 313, 316, 321. Under <u>Wilburn Boat</u> and its

---

[39]Docket No. 26-1 at 20-32.

[40]Docket No. 35-1 at 14-21.

[41]Docket No. 39 at 19-21.

ORDER – Cross-Motions for Summary Judgment - 10 -

progeny, "the initial inquiry of the courts in interpreting a policy of marine insurance [is] to determine whether there is an established federal maritime law rule." Galilea, LLC v. AGCS Marine Ins. Co., 879 F.3d 1052, 1058 (9th Cir. 2018) (alteration in original) (quoting Certain Underwriters at Lloyd's, London v. Inlet Fisheries Inc., 518 F.3d 645, 649-50 (9th Cir. 2008)). If an established federal maritime law rule exists, federal admiralty law governs the policy provision in question. Id. But, "in the absence of a federal statute, a judicially fashioned admiralty rule, or a need for uniformity in admiralty practice," state law governs. Id. (quoting Suma Fruit Int'l v. Albany Ins. Co., 122 F.3d 34, 35 (9th Cir. 1997)); see also Yu v. Albany Ins. Co., 281 F.3d 803, 806 (9th Cir. 2002) ("Disputes arising under marine insurance contracts are governed by state law . . . unless an established federal rule addresses the issues raised, or there is a need for uniformity in admiralty practice.").

Regarding whether the parties' P&I policy gave defendants a duty to defend plaintiffs, there appears to be no established federal admiralty rule on the question. A P&I policy "is an indemnity policy, and not a liability policy, although the indemnity provides the shipowner with liability coverage." Robert T. Lemon II, Allocation of Marine Risks: An Overview of the Marine Insurance Package, 81 Tul. L. Rev. 1467, 1480 (2007). "The classic approach concerning standard P&I insurance is that the policy does not provide a duty to defend, but rather an option to defend. Courts have reasoned that P&I policies only obligate the insurer to eventually compensate the insured for his defense costs." Stephen V. Rible, A Juxtaposition of Hull and Protection & Indemnity Coverages, 83 Tul. L. Rev. 1189, 1196 (2009) (footnotes omitted).

But this "classic approach" is not an established federal admiralty rule. See id. ("The issue of whether a [P&I] policy provides duty-to-defend coverage, however, is

ORDER – Cross-Motions for Summary Judgment                                        - 11 -

dependent upon state law. No federal maritime law exists on the subject. State courts occasionally disagree on the nature of the duty-to-defend obligation." (footnote omitted)). The parties have provided no citation to any controlling contrary authority, nor has the court discovered any in its own research.[42]   Consequently, the court concludes that no judicially established, federal admiralty rule governs whether P&I policies create a duty to defend. The parties have also identified no controlling federal statute or need for uniformity in admiralty practice on the issue, nor has the court discovered any in its research. Thus, under the Wilburn Boat paradigm, Alaska law will govern whether the parties' P&I policy imposed upon defendants a duty to defend plaintiffs against the State's lawsuit.

Under Alaska law, "[a]n insurer's duty to defend and its obligation to indemnify are separate and distinct contractual elements." Tush v. Pharr, 68 P.3d 1239, 1249 (Alaska 2003) (quoting Fejes v. Alaska Ins. Co., 984 P.2d 519, 522 (Alaska 1999)). Alaska law imposes upon insurers a contractual duty to defend their insureds in litigation "whenever a complaint sufficiently alleges an issue of liability covered by the policy on its face, 'even if the allegations of the complaint are false or groundless.'" Id. at 1249 (quoting Allstate Ins. Co. v. Roelfs, 698 F. Supp. 815, 817 (D. Alaska 1987)). "Thus, even though facts extrinsic to the pleadings may show that there will be no ultimate liability under the policy, if the complaint on its face alleges facts which, standing alone, give rise to a possible finding of liability covered by the policy, the insured has a

---

[42]The authorities defendants cite for their contrary conclusion consist solely of two decisions by courts in other circuits. See Docket No. 39 at 19-21 (citing Gabarick v. Laurin Maritime (Am.), Inc., 650 F.3d 545, 552-53 (5th Cir. 2011), and Stevanna Towing, Inc. v. Atl. Specialty Ins. Co., No. 2:15-CV-01419-DSC, 2020 WL 8413511, at *3 (W.D. Pa. Apr. 24, 2020)). The Fifth Circuit's statement in Gabarick that "P&I policies do not ordinarily create a duty to defend" is dicta. See 650 F.3d at 552-53 & n.15.

ORDER – Cross-Motions for Summary Judgment                                    - 12 -

contractual right to a proper defense at the expense of the insurer." Sauer v. Home Indem. Co., 841 P.2d 176, 180 (Alaska 1992) (quoting Afcan v. Mut. Fire, Marine & Inland Ins. Co., 595 P.2d 638, 645 (Alaska 1979)). "Even if coverage is ultimately denied, and even if it were later determined that there was no possibility of coverage, that denial has no retroactive effect on the duty to defend." Att'ys Liab. Prot. Soc'y, Inc. v. Ingaldson Fitzgerald, P.C., 370 P.3d 1101, 1112 (Alaska 2016), abrogated on other grounds in Buntin v. Schlumberger Tech. Corp., 487 P.3d 595, 598 n.4 (Alaska 2021).

The Alaska Supreme Court has never held that Alaska law treats P&I policies any differently than liability policies with respect to imposing contractual duties to defend upon insurers. Admittedly, at least one Alaska Supreme Court decision has spoken of the duty to defend as being possessed by "[l]iability insurers," CHI of Alaska, Inc. v. Emps.' Reinsurance Corp., 844 P.2d 1113, 1115 (Alaska 1993), and most of the court's published duty-to-defend decisions have involved liability policies. E.g., Tush, 68 P.3d at 1248; Sauer, 841 P.2d at 178-79; Afcan, 595 P.2d at 641. But neither those cases nor any other published Alaska Supreme Court precedent holds that the duty to defend is limited only to liability insurers, or that P&I policies do not create a duty to defend.

To the contrary, the Alaska Supreme Court's decision in Lloyd's & Inst. of London Underwriting Cos. v. Fulton (Fulton II), 2 P.3d 1199 (Alaska 2000), indicates that P&I policies do create such a duty under Alaska law. In Fulton II, the Alaska Supreme Court addressed whether an insurer had breached its duties to an insured under a P&I policy. The court affirmed the superior court's ruling that the insurer should have given the insured notice of its intent to deny coverage, recognizing that the insurer's "requirement of prompt and adequate notice arises from, and is integrally related to, an insurer's duty to defend." Id. at 1204. The court also affirmed the trial court's finding

ORDER – Cross-Motions for Summary Judgment - 13 -

that the insurer had taken action that breached its duty to defend the insureds and thereby caused them actual prejudice.  Id. at 1208-09.  By so doing, the Fulton II court's decision implies that the P&I policy created a duty to defend.[43]

But more importantly, the Fulton II court expressly invoked duty-to-defend holdings from previous liability policy cases and applied them to the P&I policy at issue in the case.  Id. at 1207-08.  The court stated:  "We have previously recognized that '[a]n insurer's obligation to defend and the obligation to indemnify are separate and distinct elements' and that an 'insurer may have an obligation to defend although it has no ultimate liability under the policy.'"  Id. at 1207 (alteration in original) (first quoting Sauer, 841 P.2d at 180, then quoting Afcan, 595 P.2d at 645).  It explained that this language meant that, when determining whether to impose coverage by estoppel under Alaska law, courts should determine whether an insured was prejudiced by evaluating whether the insurer's violation of its duty to defend caused the insured actual harm, not whether the outcome was affected.  Id. at 1207-08.  The court applied this language to the P&I policy at issue in the case, affirming the trial court's finding that the insurer's actions had actually prejudiced the insured.  Id. at 1208-09.  By expressly quoting and directly applying its duty-to-defend precedents to the case, the Fulton II court's decision clearly implies that, under Alaska law, P&I policies impose upon insurers the same contractual duty-to-defend that liability policies impose.

---

[43]Defendants assert that the Fulton cases are inapposite because the insurers in those cases had "chosen to defend the question presented and had nothing to do [sic] with the duty and was purely related to the insurers [sic] investigation to potentially deny indemnity."  Docket No. 39 at 21 n.59.  But nothing in the reported facts of the Fulton cases indicates that the insurers thought they had no duty to defend the insureds and chose to defend them anyway.  And even if they did, those facts would be of little significance because, as described in the next paragraph, the Alaska Supreme Court's decision speaks of the duty's existence without reference to any such choices by the insurers.

ORDER – Cross-Motions for Summary Judgment                                      - 14 -

Applying these principles to the present case, the court concludes that plaintiffs' P&I policy imposed upon defendants a duty to defend, independent of the "information" clause or "timely reporting" obligation. The language in plaintiffs' P&I policy was nearly identical to the P&I policy language that the Alaska Supreme Court considered to have created a duty to defend in Fulton II.[44] Because the language of the parties' P&I policy is substantially identical to the language that supported the existence of a duty to defend in the P&I policy in Fulton II, the court concludes that the parties' policy likewise imposed upon defendants a contractual duty to defend Faulkner Walsh.

(2)    Did Defendants Breach Their Duty to Defend Plaintiffs?

The court also concludes that defendants' refusal to defend plaintiffs against the State's lawsuit breached their duty to defend plaintiffs. The P&I policy which insured plaintiffs' vessels provided in relevant part coverage for

> Costs or expenses of, or incidental to, the removal of the wreck of the vessel named herein when such removal is compulsory by law. . . . [[45]]

The allegations in the State's complaint manifestly involved conduct covered by the policy: namely, the operation and sinking of the Delta Chief during the period in which the policy was in effect.[46] In the denial-of-coverage letter that defendants sent plaintiffs in September 2017, defendants freely acknowledged that the State's complaint presented on its face at least one issue of liability that was potentially covered by the policy.

---

[44]Compare Docket No. 26-6 at 8-9, lns. 10-13, 19-20, 28-30, 70-72, 74-78, with Fulton v. Lloyds & Inst. of London Underwriting Cos. (Fulton I), 903 P.2d 1062, 1068 (Alaska 1995).

[45]Docket No. 26-6 at 8, lns. 19-20.

[46]See Docket No. 1-1 at 41-45, ¶¶ 11-52.

ORDER – Cross-Motions for Summary Judgment    - 15 -

> [Denial of Coverage]:
>
> As noted above, [the State]'s Complaint arises from the October 5, 2012, sinking of the DELTA CHIEF and Faulkner Walsh's failure to remove the wreck from the riverbed. . . . The Policy provides wreck removal coverage for the DELTA CHIEF under the SP-38 Form. . . . [The State] alleges that it demanded that Faulkner Walsh remove the wreck immediately after its sinking. Thus, wreck removal <u>would be covered under the Policy in the absence of any exclusionary language or other applicable policy provisions.</u>[47]

This letter unequivocally demonstrates that the defendants knew the state's complaint presented on its face an issue of liability covered by the policy. The State's complaint triggered defendants' duty to defend by sufficiently alleging on its face a possible issue of liability under the policy. Thus, even though "facts extrinsic to the pleadings may [have] show[n] that there w[ould] be no ultimate liability under the policy," defendants had an independent contractual duty to defend plaintiffs against the State's lawsuit. <u>Sauer</u>, 841 P.2d at 180. Defendants' refusal to defend plaintiffs was therefore wrongful, and plaintiffs are entitled to summary judgment in their favor on this issue.

        (3)    <u>Are Defendants Estopped from Denying Coverage for the Delta Chief?</u>

Plaintiffs further assert that because defendants wrongfully refused to defend them against the State's lawsuit, defendants are estopped from denying coverage for the

---

[47]Docket No. 26-34 at 7 (emphasis added).

ORDER – Cross-Motions for Summary Judgment         - 16 -

sinking of the Delta Chief.[48]  Defendants maintain that they "had no duty to defend [Faulkner Walsh], so this case is not applicable as a basis for coverage by estoppel."[49] Regarding the initial choice of law question, at least one published Ninth Circuit decision has applied state law to an allegation of coverage by estoppel in a marine insurance policy dispute.  See Yu, 281 F.3d at 811-12.  Because the parties have not identified any established federal admiralty rule, federal statute, or need for uniformity in federal admiralty practice relevant to the application of coverage by estoppel in marine insurance contracts, the court will apply Alaska state law to this issue.

In Alaska law, coverage by estoppel is "the usual remedy for breaches of the insurer's duty to defend." Progressive Cas. Ins. Co. v. Skin, 211 P.3d 1093, 1103 n.38 (Alaska 2009).  Except in one specific circumstance, Alaska law provides that "an insurer's breach of the duty to defend must be considered a material breach that estops denial of coverage unless the breach clearly has no adverse impact on the relationship between the insurer and the insured." Fulton II, 2 P.3d at 1209.[50]

In the present case, the court has concluded that defendants wrongfully refused to defend plaintiffs against the State's lawsuit.  Defendants' refusal to defend plaintiffs clearly had an adverse impact on their relationship.  Their refusal forced plaintiffs to defend themselves against the State's lawsuit without the assistance of defendants and defendants' counsel, who presumably have extensive experience in litigation involving

---

[48]Docket No. 26 at 43-47.

[49]Docket No. 39 at 29-30.

[50]The one circumstance in which the Alaska Supreme Court has held that coverage by estoppel does not apply is "where an insurer has violated only its duty of disclosure with regard to a coverage defense that is unrelated to the coverage defense that forms the basis for the insurer's ultimate denial of coverage." Skin, 211 P.3d at 1103 n.38.

ORDER – Cross-Motions for Summary Judgment                                         - 17 -

marine vessels. Thus, as with the insurers in <u>Fulton II</u>, even though defendants' wrongful refusal to defend plaintiffs may not have been "outcome-determinative," it still "adversely affect[ed]" the plaintiffs and "[was] therefore prejudicial." 2 P.3d at 1209. The court therefore concludes that coverage by estoppel is the appropriate remedy for defendants' refusal to defend plaintiffs, and defendants are estopped from denying coverage for the <u>Delta Chief</u>'s sinking.

B. <u>Claims 2 and 3 – Breach of Covenant of Good Faith and Fair Dealing</u>

Defendants seek summary judgment in their favor on Claims 2 and 3, which allege breach of the covenant of good faith and fair dealing sounding in contract and tort, respectively. Plaintiffs oppose defendants' motion and cross-move for summary judgment in their favor on the issue of liability for these two claims.

As an initial matter, the court must determine which law governs plaintiffs' bad faith claims. There appears to be no established federal admiralty rule for marine insurance bad faith claims in the Ninth Circuit. <u>See</u>, <u>e.g.</u>, <u>Bohemia, Inc. v. Home Ins. Co.</u>, 725 F.2d 506, 511-14 (9th Cir. 1984) (applying state law to a marine insurance bad faith claim). Because the parties point to no other relevant judicially established admiralty rule, federal statute, or need for uniformity in federal admiralty practice, the court concludes that Alaska law governs these claims.

In Alaska law, all contracts contain an implied covenant of good faith and fair dealing as a matter of law. <u>Alaska Pac. Assurance Co. v. Collins</u>, 794 P.2d 936, 947 (Alaska 1990). In insurance contracts, breaches of this covenant can create both contract and tort liability. <u>Lockwood v. Geico Gen. Ins. Co.</u>, 323 P.3d 691, 697 n.19 (Alaska 2014); <u>State Farm Mut. Auto. Ins. Co. v. Weiford</u>, 831 P.2d 1264, 1266 (Alaska 1992). Plaintiffs are free to sue under either theory, the primary difference being the availability

ORDER – Cross-Motions for Summary Judgment                                    - 18 -

of punitive damages.  Lockwood, 323 P.3d at 697 n.19.  Whether a breach of the covenant has occurred is a question of fact.  Laybourn v. City of Wasilla, 362 P.3d 447, 452 (Alaska 2015)

In the contract context, the implied covenant has a subjective element and an objective element.  Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Motors Corp., 221 P.3d 977, 992 (Alaska 2009).  The subjective element "prohibits one party from acting to deprive the other of the benefit of the contract," and the objective element "requires each party to act in a manner that a reasonable person would regard as fair."  Id. (internal quotation marks omitted) (quoting McConnell v. State, Dep't of Health & Soc. Servs., Div. of Med. Assistance, 991 P.2d 178, 187 (Alaska 1999)).  To establish a breach of the covenant sounding in contract, a party must prove that the other party violated at least one of these two elements.  See Laybourn, 362 P.3d 447, at 458 ("A party asserting a breach of the covenant must prove that the other party failed to act in subjective good faith, 'meaning that it cannot act to deprive the other party of the explicit benefits of the contract,' or that it failed to act 'in objective good faith, which consists of acting in a manner that a reasonable person would regard as fair.'" (quoting Casey v. Semco Energy, Inc., 92 P.3d 379, 384 (Alaska 2004)).

In the tort context, the law is less clear.  The Alaska Supreme Court has never comprehensively defined the elements of an insurer bad faith tort claim.  Lockwood, 323 P.3d at 697 & n.20; Hillman v. Nationwide Mut. Fire Ins. Co., 855 P.2d 1321, 1323 (Alaska 1993).  At a minimum, the tort requires an insurer to have acted in a way that was "objectively unreasonable under the circumstances."  Lockwood, 323 P.3d at 697-98; see also Ennen v. Integon Indem. Corp., 268 P.3d 277, 287 (Alaska 2012) ("[T]he tort of bad faith 'requires that the insurance company's refusal to honor a claim be made without a

reasonable basis.'" (quoting <u>Hillman</u>, 855 P.2d at 1324)).  But "[w]hether the insured must also show some sort of culpable mental state in addition to objective unreasonable-ness . . . is a matter left open by [Alaska] case law."  <u>Lockwood</u>, 323 P.3d at 697 n.21.

  The Alaska Supreme Court has held insurer actions such as making a settlement offer significantly below the damages estimate and ultimate payment amount, <u>Weiford</u>, 831 P.2d at 1267-68, and wrongfully denying an underinsured motorist (UIM) claim under a policy approved by the Alaska Division of Insurance, <u>Ennen</u>, 268 P.3d at 287-88, sufficient to support bad faith tort liability.  Conversely, the Alaska Supreme Court has held that no factual basis for a bad faith claim existed where an insurer denied coverage based on an explicit exclusion clause in a policy, even though the clause's validity was unclear.  <u>Hillman</u>, 855 P.2d at 1325-26.

  Applying these principles to the present case, the court concludes that genuine disputes of material fact preclude determination of Claims 2 and 3 at the summary judgment stage.  The crux of these claims is the reasonableness of defendants' decision to deny coverage for plaintiffs' insurance claim and their refusal to defend plaintiffs against the State's lawsuit.  Although the court has concluded that defendants wrongfully refused to defend plaintiffs, no Alaska Supreme Court precedent holds that such denials of coverage and wrongful refusals to defend constitute bad faith <u>per se</u>.  As the court interprets the Alaska Supreme Court's precedents, the question in the tort context is whether defendants' denial of coverage and refusal to defend plaintiffs were "made without a reasonable basis," <u>Ennen</u>, 268 P.3d at 287 (quoting <u>Hillman</u>, 855 P.2d at 1324), and, in the contractual context, whether defendants' denial of coverage and refusal to defend were made "to deprive [Plaintiffs] of the benefit of the contract" or made "in a manner that a reasonable person would describe as [un]fair."  <u>Anchorage Chrysler Ctr.</u>,

ORDER – Cross-Motions for Summary Judgment       - 20 -

221 P.3d at 992 (quoting <u>McConnell</u>, 991 P.2d at 187). These are fact-intensive questions that touch on aspects of defendants' conduct, such as the reasonableness of its actions under the prevailing standards of the insurance industry, that the evidence the parties have offered does not address.[51] Accordingly, neither plaintiffs nor defendants have met their individual burdens as movants, and both parties' motions for summary judgment with respect to Claims 2 and 3 are denied.

Conclusion

For the reasons described in this order, the court concludes that, regarding Claim 1, as a matter of law on undisputed facts, defendants are liable to plaintiffs for breach of contract for wrongfully refusing to defend plaintiffs against the State's lawsuit, and that defendants are estopped from denying coverage for the <u>Delta Chief</u>'s sinking. Regarding the allegations of bad faith in Claims 2 and 3, the court concludes that neither plaintiffs nor defendants are entitled to summary judgment. Accordingly, defendants' motion for summary judgment[52] is denied, and plaintiffs' cross-motion for partial summary judgment[53] is granted as to Claim 1 and denied as to Claims 2 and 3.

DATED at Anchorage, Alaska, this  11th  day of July, 2022.

/s/   H. Russel Holland
United States District Judge

---

[51]Defendants assert that they "cannot be found liable for bad faith or breach of the covenant of good faith and fair dealing" because, due to Faulkner Walsh's failure to provide a certification letter, "there was never coverage under the Policy for the sinking of the <u>Delta Chief</u>." Docket No. 1-1 at 28. But this argument is unavailing because, as the court has just held, defendants are estopped from denying the existence of coverage for the <u>Delta Chief</u>'s sinking.

[52]Docket No. 26.

[53]Docket No. 35.